IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 4, 2020

**IN RE KELTY F.**

**Appeal from the Circuit Court for Hamblen County**
**No. 18CV065        Thomas J. Wright, Judge**

_____

**No. E2019-01383-COA-R3-PT**

_____

This is a termination of parental rights case. The child at issue was removed after her umbilical cord blood tested positive at birth for methamphetamine and amphetamine. The trial court found, by clear and convincing evidence, that mother's parental rights should be terminated on the grounds of abandonment by the willful failure to visit and the willful failure to provide a suitable home for the child, substantial noncompliance with the permanency plans, persistence of conditions, and failure to manifest an ability and willingness to assume custody or financial responsibility of the child. The trial court further found, by clear and convincing evidence, that termination was in the best interests of the child. Having reviewed the record on appeal, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded**

ARNOLD B. GOLDIN, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and, JOHN W. MCCLARTY J., joined.

Gerald T. Eidson, Rogersville, Tennessee, for the appellant, Tracy F.

Herbert H. Slattery, III, Attorney General and Reporter; Jordan K. Crews, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**I. BACKGROUND AND PROCEDURAL HISTORY**

The child at issue in this case, K.F. ("the Child")[1], was born on November 14,

---

[1] In cases involving minor children, it is this Court's policy to redact names sufficient to protect the children's identities.

2016 to Tracy F. ("Mother") and Joseph F. ("Father")[2]. Upon her birth, the Child's umbilical cord blood tested positive for methamphetamine and amphetamine. On December 30, 2016, Mother and Father submitted to urine drug screens, and both tested positive for methamphetamine. The Child was removed from their custody later that day. Within the first month after the Child was removed from Mother's and Father's custody, Mother informed April Hensley, the DCS family service worker assigned to this case, that she was moving to Virginia to live with her parents.

On January 4, 2017, the Tennessee Department of Children's Services ("DCS") filed a petition alleging that the Child was dependent and neglected based on the parents' positive drug screens and the fact that the Child's umbilical cord blood had tested positive at birth. Additionally, DCS alleged that the Child was the victim of severe child abuse. On March 22, 2017, the Hamblen County Juvenile Court (the "juvenile court") adjudicated the Child dependent and neglected and found that Mother had subjected the Child to severe child abuse because she "knowingly and recklessly used illicit drugs . . . during a time that she knew she was pregnant with the [C]hild while also knowing that her actions were likely to cause serious bodily injury or death to the [C]hild.". Additionally, the juvenile court ordered that the Child remain in DCS custody. Mother appealed the severe-abuse finding to the Hamblen County Circuit Court (the "trial court") on March 31, 2017.

On January 26, 2017, DCS developed a permanency plan for Mother.[3] Under the plan, Mother was required to, among other things: pay all child support as required by the courts or child support enforcement; attend all scheduled visits and conduct herself in an appropriate manner during such visits; complete parenting classes; submit to random drug screens; demonstrate appropriate caregiving during all interactions with the Child; maintain a budget and provide a copy of all bills and all income; complete alcohol and drug, mental health, and psychological assessments; obtain and maintain a legal source of income and provide proof thereof; ensure that all of the Child's educational needs are met; obtain and maintain safe and stable housing and provide proof thereof; and allow DCS to conduct home studies. Mother, however, was noncompliant with the majority of her responsibilities set out in the permanency plan throughout the custodial period, especially those pertaining to her drug use and visitation. Mother admitted that she continued to use drugs following the Child's removal. Moreover, on March 22, 2017, Mother again tested positive for methamphetamine and amphetamine, and she refused two drug screens in July 2017 and one in October 2017. Mother did submit to a hair-follicle drug screen on January 30, 2018—and tested positive for methamphetamine and amphetamine—but that was the last time Mother submitted to a drug screen. As to

---

[2] Father did not appeal the termination of his parental rights to the Child and is not a party to this appeal.

[3] A second permanency plan was developed for Mother on November 8, 2017. Mother's responsibilities under the second plan remained virtually unchanged from the first.

Mother's visitation, DCS offered her 46 visits throughout the custodial period, but she only attended 15. 13 of those 15 visits occurred during the first year of the custodial period. Additionally, in December 2017, Ms. Hensley arranged and received funding for therapeutic visitations in order to assist Mother in dealing with the Child's behavioral issues during the visits. Eight therapeutic visitations were offered, but Mother only attended one. Accordingly, the therapeutic visitations were cancelled in May 2018 due to Mother's noncompliance. At the time of trial on May 6, 2019, Mother had not visited the Child since June 20, 2018.

On May 2, 2018, DCS filed a petition with the trial court to terminate the parental rights of Mother and Father (the "Petition"). DCS sought termination on six grounds: (1) abandonment by failure to visit the Child; (2) abandonment by failure to find a suitable home; (3) substantial noncompliance with the permanency plan; (4) persistence of conditions; (5) severe child abuse; and (6) failure to manifest an ability to parent. Upon DCS's motion, the trial court consolidated Mother's severe-abuse appeal—from the juvenile court's April 13, 2017 dependency and neglect order—with the Petition. Following a trial that was conducted on May 6, 2019, and, on July 5, 2019, the trial court issued its order, wherein it terminated Mother's and Father's parental rights to the Child on the grounds of abandonment by failure to visit the Child, abandonment by failure to find a suitable home, substantial noncompliance with the permanency plan, persistence of conditions, and failure to manifest an ability to personally assume custody of the Child. The trial court, however, found that DCS failed to prove the ground of severe child abuse by clear and convincing evidence.[4] Additionally, the trial court found that termination of Mother's and Father's parental rights was in the best interest of the Child. Mother timely filed this appeal.

## II. ISSUES PRESENTED

There are two dispositive issues on appeal, which we restate as follows:

1. Whether there is clear and convincing evidence to support at least one of the five grounds found by the trial court for termination of Mother's parental rights.[5]

---

[4] Specifically, the trial court concluded that DCS "failed to prove that Mother 'knowingly' exposed her unborn child to methamphetamine" because Mother had testified that she stopped using drugs when she discovered that she was pregnant.

[5] While Mother does not challenge the trial court's findings as they pertain to the grounds for termination, the Tennessee Supreme Court has instructed this Court to "review a trial court's findings regarding all grounds for termination and whether termination is in a child's best interests, even if a parent fails to challenge these findings on appeal." *In re Carrington H.*, 483 S.W.3d 507, 511 (Tenn. 2016).

2. If so, whether there is clear and convincing evidence to support the trial court's determination that termination of Mother's parental rights is in the Child's best interests.

## III. STANDARD OF REVIEW

Under both the United States and Tennessee Constitutions, a parent has a fundamental right to the care, custody, and control of his or her child. *Stanley v. Illinois*, 405 U.S. 645, 651 (Tenn. 1972); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996). Thus, the state may interfere with parental rights only when a compelling interest exists. *Nash-Putnam*, 921 S.W.2d at 174-75 (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). Our termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g)). A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Because of the fundamental nature of a parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. *Santosky*, 455 U.S. at 769. Accordingly, both the grounds for termination and that termination of parental rights is in the child's best interests must be established by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c)(1); *In re Valentine*, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *Id.*

In view of the heightened standard of proof in termination of parental rights cases, a reviewing court must modify the customary standard of review in Tennessee Rule of Appellate Procedure 13(d). As to the trial court's findings of fact, our review is de novo with a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). We must then determine whether the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

## IV. GROUNDS FOR TERMINATION OF PARENTAL RIGHTS

As noted earlier, the trial court relied on five statutory grounds in terminating Mother's parental rights: (1) abandonment by failure to visit the Child; (2) abandonment by failure to find a suitable home; (3) substantial noncompliance with the permanency plan; (4) persistence of conditions; and (5) failure to manifest an ability to parent. Although only one ground must be proven by clear and convincing evidence in order to terminate a parent's rights, the Tennessee Supreme Court has instructed this Court to review every ground relied upon by the trial court to terminate parental rights in order to prevent "unnecessary remands of cases." *In re Angela E.*, 303 S.W.3d 240, 251 n.14 (Tenn. 2010). Accordingly, we will review each of the foregoing grounds on which the trial court relied in terminating Mother's parental rights.

### A. Abandonment by Willful Failure to Visit and Willful Failure to Provide a Suitable Home

The trial court found by clear and convincing evidence that Mother's parental rights should be terminated on the ground of abandonment by willful failure to visit and willful failure to provide a suitable home pursuant to Tennessee Code Annotated sections 36-1-113(g)(1) and 36-1-102(1)(A)(i)-(ii).[6] In pertinent part, Tennessee Code Annotated section 36-1-113(g) provides:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
> (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has

---

[6] As this Court noted in a previous opinion:

> Effective July 1, 2018, the General Assembly has amended Tennessee Code Annotated § 36-1-102(A) to substitute the phrase, "proceeding, pleading, petition, or any amended petition," in place of "proceeding or pleading." *See* 2018 Tenn. Pub. Acts, Ch. 875, § 1 (H.B. 1856). Pursuant to the same amendment, the words, "willful" and "willfully," have been deleted wherever they previously appeared in subsection - 102(1), and a new subsection, -102(1)(I), has been added, providing that the "absence of willfulness" shall be an affirmative defense to abandonment for failure to visit or support, for which "[t]he parent or guardian shall bear the burden of proof." *See id.* at § 2.

*In re J'Khari F.*, M2018-00708-COA-R3-PT, 2019 WL 411538, at *4 (Tenn. Ct. App. Jan. 31, 2019). Since the Petition in this case was filed in May 2018, prior to the amendment to the statute, we will confine our analysis in this Opinion to the version of Tennessee Code Annotated § 36-1-102 in effect at that time.

occurred[.]

Tenn. Code Ann. § 36-1-113(g)(1). As is relevant here, Tennessee Code Annotated section 36-1-102 defines abandonment as follows:

> (i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child;
>
> (ii) The child has been removed from the home of the parent or parents or the guardian or guardians as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]

Tenn. Code Ann. § 36-1-102(1)(A)(i)-(ii). Here, DCS filed the Petition on May 2, 2018, and Mother was not incarcerated during the four months preceding the filing. Accordingly, we look to the four-month period immediately preceding this date.

In *In re Audrey S.*, this Court discussed willfulness in the context of termination of parental rights cases:

> The concept of "willfulness" is at the core of the statutory definition of abandonment. A parent cannot be found to have abandoned a child under Tenn. Code Ann. § 36-1-102(1)(A)(i) unless the parent has either

"willfully" failed to visit or "willfully" failed to support the child for a period of four consecutive months . . . . In the statutes governing the termination of parental rights, "willfulness" does not require the same standard of culpability as is required by the penal code. Nor does it require malevolence or ill will. Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvert. Conduct is "willful" if it is the product of free will rather than coercion. Thus, a person acts "willfully" if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing . . . .

The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations. Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct.

*In re Audrey S.*, 182 S.W.3d 838, 863–64 (Tenn. Ct. App. 2005) (internal citations and footnotes omitted).

The trial court found that Mother abandoned the Child by willfully failing to visit her during the four months preceding the filing of the Petition to terminate her parental rights. A parent willfully abandons his or her child by failing to visit them if he or she fails to engage in more than mere "token visitation" with the child. Tennessee Code Annotated section 36-1-102 defines "token visitation" as visitation that, under the individual circumstances of the case, "constitutes nothing more than perfunctory visitations or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child[.]" Tenn. Code Ann. § 36-1-102(1)(C).

Here, during the relevant statutory period, Mother visited the child only once—on January 18, 2018—and the trial court found that the visit was only token visitation. Accordingly, Mother's failure to visit the Child clearly constitutes abandonment as defined by the statute. Mother, however, maintains on appeal that her failure to visit was not willful. Specifically, Mother states that, "[d]espite the distance to be traveled while she lived in Virginia, she was never offered the option to visit with her child by video chat or Facetime" and that DCS never attempted to assist her with transportation. The trial court disagreed with Mother's assertions, stating that, while "Mother claimed that living in Virginia created difficulties in scheduling visitation[,] Mother had access to transportation." Specifically, the trial court stated as follows in its oral findings of fact:

I find that the failure to visit was willful. During the year that you [Mother] had several visits, you were able to access not only how to do the visits, but access transportation to get there. You testified about all the places that

you worked. So, you were making money. And you certainly had the ability to work. And you didn't have any expenses for a significant part of that period of time . . . . You were living at your parents' house. And sometimes you could get them to drive you and sometimes you couldn't, but there are other forms of transportation.

After our review of the record, we agree with the trial court that Mother's failure to visit was willful. Mother attempts to paint her failure to visit as being out of her control. *See In re A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2006) ("[A] parent who attempted to visit and maintain relations with his child, but was thwarted by the acts of others and circumstances beyond his control, did not willfully abandon his child."); *see also In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009) ("A parent's failure to visit may be excused by the acts of another only if those acts actually prevent the parent from visiting the child or constitute a significant restraint or interference with the parent's attempts to visit the child."). Here, Mother does not point to any acts by DCS that "thwarted" or "actually prevented" her from visiting the Child. Moreover, the record reflects that Mother failed to cooperate with DCS and never asked for assistance to be provided to her. Ms. Hensley testified as follows:

Q: How many times did she [Mother] refuse to give you information?
A: Almost every time that I asked for information.
Q: How many times did she avoid answering direct questions?
A: Almost every time that I asked.
Q: How many times did she say DCS—that she did not need DCS's help?
A: I know of at least two occasions.
Q: Okay. Did she ever ask you for a bus ticket to get form Virginia to Tennessee to visit [the Child]?
A: No.

Accordingly, we conclude that there was clear and convincing evidence to establish that Mother abandoned the Child by willfully failing to visit her during the relevant statutory period.

The trial court also found that Mother abandoned the Child by willfully failing to provide a suitable home. This Court has previously noted that "[a]n essential element of this ground for termination is proof that '[t]he child has been removed from the home of the parent . . . as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department . . . .'" *In re Aiden R.*, No. E2015-01799-COA-R3-PT, 2016 WL 3564313, at *7 (Tenn. Ct. App. June 23, 2016) (quoting Tenn. Code Ann. § 37-1-102(1)(A)(ii)). "[T]he mere suggestion or possibility of an order adjudicating the child dependent and neglected is not good enough." *In re R.L.M.*, No. E2013-02723-COA-R3-PT, 2015 WL 389635, at *3 (Tenn. Ct. App. Jan. 29, 2015).

Here, upon DCS' petition, the juvenile court found that the Child was dependent and neglected, and, on December 30, 2016, the Child was removed from Mother's custody. Additionally, the juvenile court found that, "based on an assessment of the family and the [C]hild's circumstances, it was reasonable to make no effort to maintain the [C]hild in the home." Further, the record reflects that DCS made reasonable efforts to assist Mother in establishing a suitable home for the Child. Ms. Hensley testified that, throughout the custodial period, she requested and received funding for Mother's alcohol and drug assessments, provided Mother with a list of local job-assistance programs and local resources *in Virginia*, including information on housing, employment, food stamps, and mental health providers.

While there is evidence of DCS's efforts, there is little, if any, evidence that Mother reciprocated those efforts, especially with regard to her substance abuse issue and unstable housing situation. DCS's efforts to assist a parent in establishing a suitable home for the child may be found to be reasonable "if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]" Tenn. Code Ann. § 36-1-102(1)(A)(ii). Similarly, as this Court has stated, "parents desiring the return of their children must also make reasonable and appropriate efforts to rehabilitate themselves and to remedy the conditions that required [DCS] to remove their children from custody." *In re Shameel S.*, No. E2014-00294-COA-R3-PT, 2014 WL 4667571, at *5 (Tenn. Ct. App. Sept. 19, 2014). After the Child's removal, Mother advised DCS that she was moving back to Virginia to live with her parents. Throughout the custodial period, however, Mother never allowed Ms. Hensley to engage with or contact her parents, which, in turn, prevented DCS from determining the home's suitability for the Child. Specifically, Ms. Hensley testified that, when she tried to procure such information, "[Mother] got very upset and stated that she did not want her family involved in the case at all and she stated that she would rather have her child in foster care than living with her parents." Further, Ms. Hensley testified that she was never entirely sure of Mother's whereabouts, stating that Mother was "kind of hard to keep up with" and that she traveled "back and forth several times from Virginia to Tennessee." With respect to Mother's lack of stable housing, Ms. Hensley testified as follows: "[Mother] would occasionally tell me she was staying with some friends at this time and then staying somewhere else another time. She always considered her parents' house as her residence, but she kind of told me one time that's where her clothes stayed." Ms. Hensley even testified that Mother had represented to her that she was homeless on multiple occasions. As to her substance abuse issue, Mother admitted that she had used methamphetamine on multiple occasions following the Child's removal.[7] Mother tested positive for

---

[7] Specifically, Mother testified as follows:

methamphetamine and amphetamine in March 2017 and refused two drug screens in July 2017. Mother last submitted to a drug screen in January 2018 and tested positive for methamphetamine and amphetamine.

After our review of the record, we agree with the trial court's finding that there is clear and convincing evidence that Mother abandoned the Child by failing to provide a suitable home, despite reasonable efforts made by DCS to assist her in doing so. Moreover, we find that it appears unlikely that Mother can establish a suitable home for the Child at an early date. Throughout the custodial period, Mother did not adequately address her unstable housing and substance abuse issues. Accordingly, we affirm the trial court's finding, by clear and convincing evidence, that Mother abandoned the Child pursuant to Tennessee Code Annotated section 36-1-102(1)(A)(ii) by willfully failing to provide a suitable home for the Child.

## B. Substantial Noncompliance with Permanency Plan

The trial court also based its termination of Mother's parental rights on her failure to comply with the permanency plans developed by DCS. Tennessee Code Annotated section 36-1-113(g)(2) provides that grounds for termination may exist when "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan[.]" Tenn. Code Ann. § 36-1-113(g)(2). As this Court has previously explained:

> Terminating parental rights based on Tenn. Code Ann. § 36-1-113(g)(2) requires more proof than that a parent has not complied with every jot and tittle of the permanency plan. To succeed under Tenn. Code Ann. § 36-1-113(g)(2), the Department must demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place, and second that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met. Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance.

*In re M.J.B.*, 140 S.W.3d at 656–57 (internal citations omitted). Additionally, because

---

Q: Do you recall how many times you used methamphetamines since [the Child] was in custody?
A: Maybe a handful.
. . . .
Q: More than five?
A: Probably more than five.

determining whether substantial noncompliance exists is a question of law, we review the issue de novo with no presumption of correctness. *In re Valentine*, 79 S.W.3d at 548.

Here, the first permanency plan was developed for Mother on January 26, 2017 and ratified by the juvenile court on March 22, 2017; the second permanency plan was developed on November 8, 2017 and ratified on March 26, 2018. As noted above, the primary issues underlying the Child's removal were those pertaining to Mother's substance abuse and unstable housing situation. Accordingly, the permanency plans' responsibilities requiring Mother to submit to drug screens and to complete alcohol, drug, and mental health assessments were reasonably related to Mother's substance abuse issue. Similarly, the plans' responsibilities requiring Mother to obtain and maintain safe and stable housing, to provide proof thereof, and to allow DCS to enter the home and conduct home studies were reasonably related to Mother's unstable housing situation.

As previously noted, however, Mother admitted to using methamphetamines on multiple occasions following the Child's removal, and she refused multiple drug screens throughout the custodial period. Mother never completed a psychological assessment, despite DCS' efforts in obtaining funding for the assessment and notifying Mother when such funding was approved. As to the permanency plans' responsibilities pertaining to visitation, Mother was offered 46 visits, but she attended only 15.[8] Further, Mother did not comply with the plans' responsibilities pertaining to her unstable housing situation. Mother considered her parents' home in Virginia as her primary residence—despite bouncing around from place to place—but never permitted DCS to contact her parents or to conduct a home study at their home. Additionally, Mother testified that she moved in with Father's ex-stepmother in Morristown, Tennessee in January 2019, but she never responded to DCS' request to conduct a home study there, either. Mother completed very few of her responsibilities under the permanency plans, and, more significantly, she failed to comply with the responsibilities aimed at addressing her substance abuse issue and unstable housing situation. Accordingly, we affirm the trial court's finding, by clear and convincing evidence, that, pursuant to Tennessee Code Annotated section 36-1-113(g)(2), Mother was substantially noncompliant with her responsibilities under the permanency plans.

### C. Persistence of Conditions

The trial court also relied on Tennessee Code Annotated section 36-1-113(g)(3) as a ground for terminating Mother's parental rights, which provides that parental rights may be terminated when the child has been removed from the home of the parent by order of a court for a period of six months and:

(A) The conditions that led to the child's removal or other conditions that in

---

[8] Moreover, of the 15 visits she did attend, Mother ended at least three of them early.

- 11 -

all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent . . . still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent . . . in the near future; and

(C) The continuation of the parent . . . and child relationship greatly diminishes the child's chance of early integration into a safe, stable and permanent home.

Tenn. Code Ann. § 36-1-113(g)(3). The purpose behind the persistence of conditions ground for terminating parental rights is "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re Arteria H.*, 326 S.W.3d 167, 178 (Tenn. Ct. App. 2010). In *In re Mickia J.,* this Court held that, "as a threshold requirement for applicability of the ground of persistence of conditions in termination of parental rights cases, the child must not only have been adjudicated dependent and neglected, but he or she must also have been removed from the defendant parent's home." *In re Mickia J.*, No. E2016-00046-COA-R3-PT, 2016 WL 5210794, at *5 (Tenn. Ct. App. Sept. 19, 2016). Here, the trial court adjudicated the Child dependent and neglected and a victim of severe child abuse, and the Child was removed from Mother's custody and placed in the custody of DCS on December 30, 2016.

In its order terminating Mother's and Father's parental rights, the trial court found that Mother had not properly addressed her substance abuse issue and unstable housing situation. With respect to the former, the trial court found, in relevant part, that

[the Child] was in foster care for approximately two (2) and a half years at the time of the hearing. She was removed from her parents['] care and custody because of drug abuse. After her removal, the parents moved to Virginia. Other conditions arose that prevented the parents from regaining custody, such as homelessness and unemployment . . . . Mother continued to test positive for methamphetamine throughout the early stages of this custodial episode incident, and even admitted to occasionally using methamphetamine . . . . Furthermore, by her own admission, Mother refused to submit to any drug screens until DCS required the foster mother to do the same. While Mother adamantly denies that she is a drug addict, this Court is unconvinced by her words. Mother has provided no proof that she has addressed her substance abuse problem[.].

Moreover, the trial court found that the conditions that led to the Child's removal still existed, preventing the Child from returning safely to the custody of Mother. We agree.

As noted throughout this opinion, and as specifically noted by the trial court in its termination order, one of the primary concerns underlying the Child's removal was Mother's substance abuse. However, at the time of trial on May 6, 2019, this concern still persisted. Mother admitted to using methamphetamine on multiple occasions following the Child's removal, and she failed[9] and refused multiple drug screens throughout the custodial period. Other concerns underlying the Child's removal also persisted. Mother failed to complete a psychological assessment; she failed to provide DCS with the necessary information and access in order to determine whether her living situation was stable and, thus, suitable for the Child; and, while she did tell Ms. Hensley that she was gainfully employed, she failed to provide proof of such employment. Mother's failures persisted throughout a two-and-a-half-year period, from the Child's removal on December 30, 2016 to the date of the trial on May 6, 2019. While "[p]ersistence of conditions focuses 'on the results of the parent's efforts at improvement rather than the mere fact that he or she had made them[,]'" Mother, here, put forth minimal effort to improve the conditions that led to the Child's removal and, thus, has little, if any, results to show for it. Accordingly, we agree that the evidence clearly and convincingly establishes the elements necessary to terminate Mother's parental rights on the ground of persistence of conditions.

### D. Failure to Manifest an Ability and Willingness to Assume Custody

Lastly, the trial court relied on Tennessee Code Annotated section 36-1-113(g)(14) as a ground for terminating Mother's parental rights, which provides that a parent's rights may be terminated if that parent

> has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Tenn. Code Ann. § 36-1-113(g)(14). This ground for termination requires DCS to establish two elements by clear and convincing proof. *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018). As to those elements, this Court has stated the following:

> DCS must prove that [the parent] failed to manifest "an ability and willingness to personally assume legal and physical custody or financial responsibility of the child[ren]." DCS must then prove that placing the children in [the parent's] "legal and physical custody would pose a risk of

---

[9] Notably, the last drug screen to which Mother submitted was on January 30, 2018—within the relevant statutory period. She tested positive for both methamphetamine and amphetamine.

substantial harm to the physical or psychological welfare of the child[ren]." *Id*. at *7-8 (internal citations omitted).

As to the first element, "[a]bility focuses on the parent's lifestyle and circumstances[,]" *In re Serenity W.*, No. E2018-00460-COA-R3-PT, 2019 WL 511387, at *6 (Tenn. Ct. App. Feb. 8, 2019), and "[p]arents demonstrate willingness by attempting to overcome the obstacles that prevent them from assuming custody or financial responsibility for the child." *In re Cynthia P.*, No. E2018-01937-COA-R3-PT, 2019 WL 1313237, at *8 (Tenn. Ct. App. Mar. 22, 2019). Here, Mother made little effort to adjust her lifestyle and circumstances. She admitted to using methamphetamines multiple times during the custodial period, she failed to complete a psychological assessment, she never provided DCS with proof of income, and she never provided DCS with the necessary access or information regarding her living situation. This same evidence supports our conclusion that placing the Child in Mother's custody "would pose a risk of substantial harm to the physical or psychological welfare of the [C]hild." Tenn. Code Ann. § 36-1-113(g)(14). Further, while Mother failed to address the concerns that led to the Child's removal, the Child has been living with her current pre-adoptive foster family—the same family with whom the Child has lived since she was one month old, which, by the time of trial, had been two-and-a-half years. In *In re Amynn K.*, we determined that placing the child at issue in the legal and physical custody of her father would pose a risk of substantial harm to her physical and psychological welfare, one reason being because "the Child had been placed with the foster parents for four years and had developed a bond with them." *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *15 (Tenn. Ct. App. June 20, 2018). Here, the Child had lived with the foster family for two-and-a-half years following her removal from Mother's custody soon after the Child's birth. Moreover, Robin Franklin, the Child's foster mother who has five children of her own, testified that the Child has adjusted well and interacts well with everybody in the home. Ms. Franklin also testified that the Child refers to her and her husband as "mommy" and "daddy". Based on the evidence presented, we conclude that DCS has proven by clear and convincing evidence that Mother failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the Child and that placing the Child in Mother's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the Child. Accordingly, and considering our affirmance of the other four statutory grounds at issue, we affirm the trial court's findings regarding the existence of the five statutory grounds for termination of Mother's parental rights.

## V. BEST INTERESTS

Having found at least one statutory ground on which to sustain termination of Mother's parental rights, we must now consider whether DCS has proven by clear and convincing evidence that termination of Mother's parental rights is in the Child's best interests. *See* Tenn. Code Ann. § 36-1-113(c)(2). Once the court has determined that the

parent is unfit based on clear and convincing evidence that one or more of the grounds for termination exists, the interests of the parent and child diverge, and the interests of the child become the court's paramount consideration. *In re Audrey S.*, 182 S.W.3d at 877. If the interests of the parent and the child conflict, the court must always resolve the conflict in favor of the rights and best interests of the child. Tenn. Code Ann. § 36-1-101(d). Tennessee Code Annotated section 36-1-113(i) sets forth the following list of factors to be considered when determining a child's best interests in a termination of parental rights case:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
> (8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
> (9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). Because long-term foster care is disfavored, "many of the statutory best interest factors relate to the likelihood that the child will be able to leave foster care and return to the parent's home in the near future." *In re Adoption of J.A.K.*, No. M2005-02206-COA-R3-PT, 2006 WL 211807, at *4 (Tenn. Ct. App. Jan. 26, 2006). If that likelihood is remote, "the best interest of the child often lies in termination

of parental rights so that the child can attain the security and stability of a permanent home through adoption." *Id*.

Here, the trial court found by clear and convincing evidence that it was in the best interest of the Child to terminate Mother's parental rights. Specifically, it found as follows, in relevant part:

> Based upon the evidence, the overriding interest is the [C]hild's stability. [The Child] has remained in the same foster home since her removal. The foster mother, Ms. Franklin, is attentive to her medical needs and is devoted to ensuring that the [C]hild has the best opportunities possible for normalcy. In order for this to be attained, [the Child] requires consistency and stability. There is no question her needs are met in her current foster home. She has bonded well with her foster parents and their other children. Mr. and Ms. Franklin love her and wish to adopt her.

> The hallmark of the parents' history during the course of this case is instability. Mother and Father have bounced in and out of the [C]hild's life. They have bounced from home to home. Mother's had several different jobs. She claims that she does not have a drug problem, but continues to use methamphetamine.

After our review of the record, we agree with the trial court and conclude that Mother has failed to make any lasting adjustment that would allow for reunification with the Child, and, as such, the best interest factors weigh in favor of terminating Mother's parental rights.

DCS became involved with Mother and the Child after receiving three referrals alleging that the Child had been exposed to drugs.[10] On December 30, 2016, Mother and Father submitted to drug screens, and both tested positive for methamphetamine, and the Child was removed from their custody and placed in the custody of DCS later that day. Mother has admitted that she continues to use drugs; she has not allowed DCS to conduct a home study, and she has failed to comply with or complete several of the permanency plans' requirements ; she has failed to exercise regular visitation, and, as a result, has no meaningful relationship with the Child .[11] Accordingly, Mother has failed to show that she can provide a healthy and safe physical environment for the Child, and we find that changing caretakers and the Child's physical environment would likely have a negative effect on the Child's psychological well-being.

---

[10] The first and second referrals were screened out, the first because Mother and Father reportedly lived in Wise County, Virginia, and the second because the referral did not contain information regarding their location.

[11] In fact, Ms. Franklin testified that, at some of the visits Mother did attend, the Child "was scared" and that there was "very limited interaction."

Mother argues on appeal that, "while the Court examined each of the nine factors[,]" it "did not make findings of facts of all the factors that the Court listed in it's [sic] oral findings." Specifically, Mother argues that the trial court "failed to make full findings of facts on factor [sic] 3, 4, 5, 7, and 8 as to whether they would weigh in favor or against the termination being in the [C]hild's best interest." We disagree. Firstly, as this Court has previously stated, "[a]scertaining a child's best interests does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent." *In re Audrey S.*, 182 S.W.3d at 878. Moreover, because "[t]he relevancy and weight to be given each factor depends on the unique facts of each case[,]" depending upon the circumstances of a particular child and a particular parent, "the consideration of one factor may very well dictate the outcome of the analysis." *Id.* (citing *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004)). Secondly, we find that the trial court's oral findings of fact, announced from the bench following the trial on May 6, 2019, as well as those contained in its final order, issued on July 5, 2019, are very detailed and sufficient.

Mother also makes numerous other arguments as to why the trial court erred in its best interest analysis. For example, Mother argues that she completed an alcohol and drug assessment. However, satisfying a responsibility in a permanency plan does not make up for the fact that Mother (1) admitted to using methamphetamines on multiple occasions following the Child's removal and (2) refused multiple drug screens throughout the custodial period. Mother also argues that she was employed at Subway and that, at the time of trial, she had recently been hired by Home Health Care. Again, however, Mother neglects important facts. While the permanency plans required Mother to obtain stable employment, they also required her to provide proof thereof—such as by providing at least three months of paystubs—which Mother never did. Mother also argues that DCS "never considered contacting the sister agency in Virginia to see what services they could assist the mother in completing." Ms. Hensley, however, testified that she personally put together a packet with information regarding resources in Virginia. Specifically, Ms. Hensley testified as follows:

> Q: Can you tell the Court what you did as far as your efforts to help her while she was in Virginia?
> A: Yes. While she was in Virginia, I went on to a Google search and I looked up providers in Virginia and sent her almost like a community resources packet that I made up on my own.
> Q: Uh-huh. And what, what was included in that packet?
> A: Housing information, like SNAP information for Food Stamps, job employment places, and also like mental health providers.

In light of the foregoing, we are satisfied that the record contains clear and convincing evidence that terminating Mother's parental rights is in the Child's best interests.

## VI. Conclusion

For the foregoing reasons, the judgment of the trial court is hereby affirmed.


_____
ARNOLD B. GOLDIN, JUDGE